STATE OF NEW YORK, Plaintiff, *v.* MILK HANDLERS AND PROCESSORS ASSOCIATION, INC., et al., Defendants.

Supreme Court, Special Term, New York County, January 6, 1967.

*Louis J. Lefkowitz, Attorney-General (Samuel A. Hirshowitz, George C. Mantzoros* and *Louis Smigel* of counsel), for plaintiff. *Weil, Gotschal & Manges (Ira M. Millstein, Marshall C. Berger* and *William J. Abelow* of counsel), for Milk Handlers and

Processors Association, Inc., and another, defendants. *Hays, Sklar & Herzberg* (*Sydney C. Winton* and *Geoffrey M. Kalmus* of counsel), for Dellwood Dairy Co., Inc., and another, defendants. *Fromer, Stein & Berko* for Gold Medal Farms, Inc., defendant. *Mumma, Crane, Costabel & Savarese* for Grandview Dairy, Inc., defendant. *Malcolm A. Hoffman* and *Abner P. Slatt* for Jerome Dairies Co., Inc., and others, defendants. *Paul, Weiss, Rifkind, Wharton & Garrison* (*Edward N. Costikyan* and *Sidney S. Rosdeitcher* of counsel), for Holland Farms, Inc., and others, defendants.

ABRAHAM J. GELLINOFF, J. Plaintiff moves for a temporary injunction and defendants cross-move to dismiss the complaint upon the grounds (1) that the complaint fails to state a cause of action; and (2) that the court lacks jurisdiction over the subject matter of the action.

1. The complaint alleges, substantially in the language of section 340 of the General Business Law, that defendants and others did " agree, arrange and combine between and among themselves to restrain competition and the free exercise of trade and commerce in the milk industry in the State of New York for the purpose of establishing and maintaining a monopoly in and unlawfully interfering with and restraining the free exercise of business, trade and commerce in the milk industry in the State of New York ". The complaint next alleges that the substantial terms of the aforesaid agreement are (a) to fix, establish, stabilize and maintain *noncompetitive* prices for sales of milk by stores to consumers; (b) to stabilize and maintain *noncompetitive* prices at which wholesaler distributors sell milk to stores (italics by court) ; (c) to allocate customers; and (d) to eliminate competition. The complaint then alleges a series of 15 specific acts which plaintiff alleges were committed by defendants and others " in furtherance " of the aforesaid agreement. The complaint then alleges that " the effects of the aforementioned " agreement have been and are: to raise prices for milk sold to consumers; to maintain and stabilize *noncompetitive* prices for milk sold to consumers; to prevent and interfere with the freedom of wholesalers and distributors to formulate and adopt new methods of distribution and packaging to reduce costs which could result in lower consumer prices; to reduce, suppress and eliminate competition in the prices of milk; and to deprive retailers and their customers of the benefits of competition. Finally, the complaint alleges that the afore-mentioned agreement is in violation of section 340 the General Business Law. Thus the complaint alleges (1) the making of an agreement, (2) the terms

of the agreement, (3) the specific acts committed in furtherance of the agreement, (4) the effects of the agreement, and (5) the violation of section 340 of the General Business Law by the agreement.

Section 340 of the General Business Law, so far as here pertinent, provides:

" 1. Every contract, agreement, arrangement or combination whereby

" A monopoly in the conduct of any business, trade or commerce * * * is or may be established or maintained, or whereby

" Competition or the free exercise of any activity in the conduct of any business, trade or commerce * * * may be restrained or whereby

" For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business, trade or commerce * * * any business, trade or commerce * * * is or may be restrained, is hereby declared to be against public policy, illegal and void."

The complaint, therefore, clearly and adequately alleges facts which, if proven at a trial, establish a plain violation of the provisions of section 340 of the General Business Law, entitling plaintiff to the relief it seeks (General Business Law, §§ 341–342; CPLR 6301).

The defendants contend that the complaint is based on the false premise that price fixing in New York is illegal per se. The gravamen of the complaint is not the fixing of prices, but the fixing of *noncompetitive* prices — for sales by wholesale distributors to stores and by stores to consumers, the allocation of customers, and the elimination of competition, thereby restraining competition and the free exercise of trade for the purpose of establishing a monopoly and unlawfully restraining the free exercise of trade. That plaintiff, in its briefs and on oral argument, unduly relied on the contention that price fixing per se constitutes a violation of the statute (generally referred to as the Donnelly Antitrust Act), is beside the point; that is a matter to be considered when determining whether an injunction should issue (*infra*). When testing the sufficiency of a complaint it is the general rule that " every allegation of fact contained in the pleading must be taken as admitted, in addition to which plaintiffs are entitled to the benefit of every fair and reasonable presumption which may be justifiably implied therefrom." (*Locher* v. *American Tobacco Co.*, 121 App. Div. 443, 449, affd. 195 N. Y. 565). The complaint therefore states a cause of action.

2. Defendants contend that this court lacks jurisdiction over the subject matter involved herein because "virtually all of the activities complained of were intertwined with collective bargaining agreements", and that, therefore, (a) "federal law preempts this area and this Court lacks jurisdiction", and (b) that the "activities herein involved are exempted from the Donnelly Act by virtue of the 'labor unions' exemption from that act".

(a) The defendant milk distributors herein buy milk from the producer, i.e., the dairyman or farmer, and, after the milk is processed, they sell it to local outlets such as the grocery store, candy store or bakery in the metropolitan area of New York City. The drivers who deliver the milk receive as their compensation, in addition to a base salary, a percentage of the wholesale price paid by the retailer. The driver, therefore, and the union which represents him, have a direct interest in the price at which milk is sold to these retail outlets. As a result of conflict between defendants and the union there was established the office of impartial chairman of the milk industry. Pursuant to his power under the collective bargaining agreement between the distributors and the union, the impartial chairman, Mr. Theodore W. Kheel, on April 21, 1966, established certain fixed markups in the price of milk to be charged by defendants to their customers, i.e., to the stores selling to the consumer.

The complaint alleges that, "pursuant to and in furtherance" of the agreement alleged in the complaint, the defendants and others "*Established* the office of Impartial Chairman and a Board of Arbitration with *jurisdiction, power and authority* to regulate, control, restrict and *eliminate methods of sale and distribution which result in lower prices*" (italics by court); that the impartial chairman established certain markups for milk jug stores, supermarkets and retail stores; and that "The decisions of the Office of Impartial Chairman are enforced by disciplinary action including a boycott or strike or threat thereof by the unions". Upon the argument of this motion, plaintiff asserted that the union and its impartial chairman are themselves parties to the unlawful agreement.

The defendants claim that the rise in milk prices and the fixing of the prices are a direct result of the contractual obligation imposed upon them under their respective contracts with the union; that, therefore, union rights are intertwined with every aspect of this case and that this proceeding constitutes a frontal attack on the collective bargaining rights of the union and the defendant employers in the milk industry; and that, consequently, "the subject matter of this dispute has been pre-empted

by the National Labor Relations Act and hence cannot be the basis for a suit in state court ".

When defendants make reference to " the subject matter of the dispute ", *a* pretended dispute between *defendants and the Union* must be distinguished from *the* dispute between *plaintiff and defendants* (the unlawful agreement alleged in the complaint). There is no dispute between defendants and the union. They have agreed. The subject matter of the dispute between plaintiff and defendants is not a charge of unfair labor practice or refusal to bargain collectively; it is not wages or working conditions. Hence, the subject matter alleged in the complaint is not cognizable by the National Labor Relations Board (cf. *San Diego Unions* v. *Garmon,* 359 U. S. 236; *Garner* v. *Teamsters Union,* 346 U. S. 485; *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468; *Construction Laborers* v. *Curry,* 371 U. S. 542, 546; *Meat Cutters* v. *Jewel Tea,* 381 U. S. 676, 686–687).

The defendants argue, however, that Congress has indicated an intent to prohibit States from interfering with, and invalidating, essential provisions of a labor contract — whether such interference be labeled State antitrust policy, labor policy, or otherwise. Defendants therefore urge that the application of State law would frustrate the solution of a problem which Congress, under the National Labor Relations Act, has required defendants and the union to negotiate in good faith toward solving (cf. *Teamsters Union* v. *Oliver,* 358 U. S. 283).

The question is whether Congress has so occupied the field of labor relations as to exclude State action *under the circumstances presented by the complaint.*

In *Florida Avocado Growers* v. *Paul* (373 U. S. 132, 142), the court said: " Federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons — either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakenly so ordained." The subject matter of the dispute between plaintiff and defendants is, as stated in the complaint, an alleged agreement between defendants and others (and " others " includes the union and the impartial chairman) to restrain competition for the purpose of establishing a monopoly and restraining the free exercise of business *in the milk industry* by means of at least 15 separate overt acts, only one of which mentions the union and the office of impartial chairman. In effect what plaintiff is charging is that " pursuant to and in furtherance of " the alleged unlawful agreement, one of the provisions of the collective bargaining agreement between defend-

ants and the union has been perverted into a device to restrain competition and to create a monopoly in the supply of milk.

The court concludes that, because the subject matter of the complaint does not seek to determine any dispute between defendant distributors and the union (there being in fact no dispute); and, because the subject matter of the dispute between plaintiff and defendants is in an area within the police power of the State, affecting the health of its inhabitants which is directly related to the price of milk (cf. *Teamsters Union* v. *Oliver*, 358 U. S. 283, 297; *Penn Dairies* v. *Milk Control Comm.*, 318 U. S. 261 [p. 279, concurring opn. of MURPHY, J.]); and, because enforcement of the Donnelly Antitrust Act does not here invalidate any provisions of the collective bargaining agreement between defendants and the union that are availed of by the union *in good faith*, this court is not divested of jurisdiction.

(b) Section 340 of the General Business Law provides that the provisions of article 22 (Donnelly Antitrust Act) shall not apply to bona fide labor unions. Defendants therefore contend that " the activities alleged in the complaint are exempted from the operation of the Donnelly Act ", and that, hence, this court lacks jurisdiction over the subject matter of the complaint.

It can hardly be supposed that the Legislature intended to give immunity and sanctity to union activities where, as here, they are alleged to be committed " pursuant to and in furtherance " of an agreement claimed to be unlawful. The reasoning of the court in *Allen Bradley Co.* v. *Union* (325 U. S. 797), is here applicable. The court said (p. 808): " Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services "; and (pp. 809–810): " The primary objective of all the Anti-trust legislation has been to preserve business competition and to proscribe business monopoly. It would be a surprising thing if Congress, in order to prevent a misapplication of that legislation to labor unions, had bestowed upon such unions complete and unreviewable authority to aid business groups to frustrate its primary objective. For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves." (See, also, *United States* v. *Women's Sportswear Assn.*, 336 U. S. 460, 464.)

The activities alleged in the complaint are not exempt from the provisions of the Donnelly Antitrust Act. To conclude otherwise would permit employers to override State laws merely by joining

with a union in a collective bargaining agreement that is contrary to State law.

3. The remaining question to be determined is whether the facts contained in the affidavits and exhibits submitted on this motion establish plaintiff's right to an injunction in advance of trial.

We are dealing here with an industry that is highly competitive and stringently regulated both by Federal and State agencies (cf. U. S. Code, tit. 7, § 601 *et seq.* [Agricultural Adjustment Act]; Agriculture and Markets Law, art. 21, § 252 *et seq.*). To start off with, the defendant milk distributors are told each month by the Federal Government how much they must pay the producer for the fluid milk. This is done under a Federal Marketing Order issued pursuant to the Agricultural Adjustment Act. The price the defendant distributors may charge to the stores also has a fixed ceiling, for, to be competitive, they must sell at a price which will enable the retailer to charge the consumer less than is charged by the large supermarkets, such as, for example, A. & P.

The only parties against whom this suit has been brought are this comparatively small group of defendants who, between them, appear to control less than 25% of the market. The so-called industry giants — Bordens, National Dairy (Sealtest) and Dairymen's League — who are alleged to control between 40% to 45% of the market, are not parties to this action. About 200 other independent companies are not parties to this action. Of course plaintiff has a right to bring this suit against only those parties as to whom it possesses evidence of alleged wrongdoing (see *Eagle Spring Water Co.* v. *Webb & Knapp,* 236 N. Y. S. 2d 266, 274 and cases cited therein). Nevertheless, the interrelationship between the present defendants and these others — all of whom have collective bargaining agreements with the same union and have the same impartial chairman — has not been presented sufficiently to persuade the court that it is the acts of *these* defendants which create the alleged monopoly, or fix prices that plaintiff claims are noncompetitive, or restrain trade.

Moreover, the stabilization of prices, in proper circumstances, and the elimination of destructive competition are not regarded as undesirable in the milk industry (see *Nebbia* v. *New York,* 291 U. S. 502; *Queensboro Farm Prods.* v. *Wickard,* 137 F. 2d 969 [2d Cir., 1943]; *Matter of Friendship Dairies* v. *Du Mond,* 284 App. Div. 147). Thus, a report dated April, 1964, prepared by a committee on milk marketing appointed by Governor Nelson A. Rockefeller and titled "Market Structure, Competition and Regulation in the Distribution of Fluid Milk", states (p. 29):

"In the Committee's opinion the most serious destructive practices involve the sale of milk at unreasonably low prices (which the Committee defines as prices so low as to make the position of efficient, low-cost competitors untenable) and unwarranted price discrimination in the sale of milk to different customers or in different sales areas."

The Committee believes that "the sale of milk by a dealer to certain customers at lower prices than to others, or in certain areas at lower prices than in other areas, without adequate justification by differences in costs, is the one likely to be most serious from the viewpoint of the public interest" (p. 62). Thus it would seem, according to the report of the committee appointed by the Governor, that the stabilization, indeed the fixing, of uniform prices in the milk industry might, under certain circumstances and conditions, even be in the best interests of the consumer.

In the case at bar it was the Impartial Chairman of the Milk Industry — not the defendant distributors — who raised the prices to be charged by the distributors to their customer stores. He did so on April 21, 1966, under the provisions of the collective bargaining agreement between the distributors and the International Brotherhood of Teamsters. This agreement, in essence, grants the union a voice in the distribution patterns in the milk industry, including methods of selling and prices. The provisions of this collective bargaining agreement were arrived at after intervention and mediation by Federal and State mediators. The fact that these representatives of governmental labor agencies participated in the negotiations which culminated in granting the Impartial Chairman power to perform the very acts of which plaintiff now complains, renders plausible defendants' contention that they are the victims of a chronic labor problem in the milk industry, the solution of which mandated the practice now claimed to be violative of the Donnelly Antitrust Act. The union and the impartial chairman are not parties to this action. Without adequate evidence as to their position and particularly that of the State and Federal mediators who helped negotiate the collective bargaining agreement, precipitate action by the court prior to trial could very well prove to be a disservice to our inhabitants who depend on defendant distributors for their daily and uninterrupted supply of milk.

In interpreting the Donnelly Antitrust Act, the rule of reason should be applied; the court in each case must scrutinize the particular conditions and purposes revealed by the evidence (*Alexander's Dept. Stores* v. *Ohrbach's, Inc.*, 266 App. Div. 535, 538). Not every agreement which fixes prices or allocates cus-

tomers, or restrains trade, violates the Donnelly Antitrust Act. "The criterion is whether the restraint is unreasonable" (*Dawn to Dusk* v. *Brunckhorst Co.*, 23 A D 2d 780, 781). In *Barns* v. *Dairymen's League Co-op. Assn.* (220 App. Div. 624), the court said: "I am convinced that our courts, like the United States Supreme Court * * * will apply the 'rule of reason' to every combination or agreement brought before them. Before it will condemn, there must appear the elements of injury to the public, or monopolistic control of a particular article of commerce, or unreasonable interference with and damage to the business of an individual, or the doing of illegal or unconscionable acts, or specific intent to do injury to some one else, or, in brief, at least some of the circumstances which would lead a court in good conscience to say that a given set of defendants were overstepping the bounds of reasonable ambition and fair play and were becoming a nuisance to their fellow men." In applying the test, "a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it" (Chief Justice HUGHES in *Appalachian Coals* v. *United States*, 288 U. S. 344, 360).

Fluid milk is regarded as an essential food, especially for children. Milk constitutes a relatively large part of the food budget. The zeal of the Attorney-General in attempting to prevent the rise in the price of milk and in protecting the consumer is therefore commendable. However, the drastic relief of a temporary injunction may be granted only upon a clear showing that plaintiff is entitled thereto and to the ultimate relief requested (see *De Candido* v. *Young Stars*, 10 A D 2d 922). A temporary injunction may not issue where the ultimate relief sought in the action is in doubt and must be resolved by a trial of the matter (see *Gittlin Bag Co.* v. *Bresky*, 279 App. Div. 570; *Saslow* v. *Novick*, 19 Misc 2d 475; *Morrin* v. *Structural Steel Bd. of Trade*, 231 App. Div. 673). On the affidavits and exhibits *alone*, the court is unable to arrive at the conclusion that defendants' acts fix prices that are noncompetitive or create a monopoly or violate the Donnelly Antitrust Act. A trial is necessary.

Plaintiff's motion for a temporary injunction is denied and the temporary restraining order is vacated. Defendants' motions are denied.

In view of the vital importance of milk to the health and welfare of our State and city and the unfortunate consequences to the consumer and the industry which might follow from a long delay in determining the issues raised in this action, this matter

should be brought to an immediate trial. Accordingly, the defendants are directed to serve and file their answer to the complaint on a day certain to be fixed in the settlement of the order to be submitted hereon. All pretrial proceedings shall be waived and the filing of a statement of readiness is dispensed with, and, subject to the approval of the Justice presiding at Trial Term, Part I, the matter is directed to be placed at or near the head of the appropriate calendar.